THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DONALD C. REIFINGER, JR.

v.                                            C.A. NO. 12-3671

PARKLAND AREA SCHOOL DISTRICT

**FILED**

MAR **2 8** 2014

MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

MEMORANDUM OPINION

SCHMEHL, J.                                   MARCH   , 2014

Plaintiff brought this action claiming that he was constructively discharged and retaliated

against by the defendant because of his age in violation of the Age Discrimination in

Employment Act ("ADEA"), 29 U.S.C. §§ 621, *et seq.* and the Pennsylvania Human Relations

Act ("PHRA"), 43 Pa.Cons.Stat. §§ 951 *et seq.*[1] Presently before the Court is the defendant's

motion for summary judgment. For the reasons which follow, the motion is granted.

Summary judgment is appropriate if there is no genuine dispute as to any material fact

and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion

for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but

will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle &

Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 247-248 (1986)). A fact is "material" if proof of its existence or non-existence might affect

the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

---

[1] Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity
Commission in 2010 ("EEOC"). In 2012, the EEOC issued plaintiff a Notice of Right to Sue.

In undertaking this analysis, the court views the facts in the light most favorable to the

non-moving party. "After making all reasonable inferences in the nonmoving party's favor, there

is a genuine issue of material fact if a reasonable jury could find for the nonmoving party."

Pignataro v. Port Auth. of N.Y. and N.J. , 593 F.3d 265, 268 (3d Cir. 2010) (citing Reliance Ins.

Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997)). While the moving party bears the initial

burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts

the burden to the non-moving party who must "set forth specific facts showing that there is a

genuine issue for trial." Anderson, 477 U.S. at 250.

## FACTS

Plaintiff was born in 1951. (Reifinger Dep. at 12.) He began his employment as a teacher

with defendant in September, 1974 at which time he primarily taught a business course for the 9th

grade. (Id. at 15-16.)  The defendant offers a classroom-based driver's education course to its

students which is primarily taught by one full-time drivers's education teacher. In addition to the

classroom instruction, defendant previously offered its students driver's instruction through its

Behind-the-Wheel ("BTW") program in which students would drive in a vehicle with a certified

driver education instructor.

In 1999, plaintiff received his driver's education teaching certification and thereafter

became a part-time instructor in the defendant's BTW program, working after school, weekends,

holidays and during the summer. (Id. at 27.) Participation as an instructor in the BTW program

was voluntary and provided additional compensation to the instructor on an hourly basis at a rate

determined by the Collective Bargaining Agreement between defendant and its teachers' union.

This hourly rate of compensation was the same for every BTW instructor and was in addition to

the instructor's salary as a teacher. ( Id. at 34, 56.) Plaintiff testified that he earned approximately $25,000 to $30,000 in additional income per year as a result of his participation in the BTW program. ( Id at 108.)

In 1999, the BTW program was administered by the full-time driver's education teacher, Donald Steele. (Id. at 30.) After Mr. Steele retired in 2003, the plaintiff became the driver's education classroom teacher at defendant's high school. (Id. at 19.) Upon becoming the full-time driver's education teacher, plaintiff took over the responsibility for scheduling the BTW program. ( Id. at 43.) At the time, the BTW program had six vehicles. Two hours of after-school driving were normally scheduled to take place at the end of the school day. An instructor and two students would be assigned to each of the six vehicles and each student would receive an hour of behind-the-wheel-driving time. Four hours of instruction per vehicle were typically scheduled for Saturdays during the school year, and on Mondays through Saturday during the summer break. (Id. at 49-52.)

When plaintiff began participating in the BTW program in 1999, the assignment of after-school hours was performed by Mr. Steele. He assigned the hours based on a seniority-system under which the most senior members of the BTW program, based on time service within the BTW program, were given preference for each day's available assignments. ( Id. at 48.) In 1999, there were more than six instructors participating in the BTW program and only six vehicles for use. As a result, the newer members of the BTW program would only get teaching assignments if the more senior members were unavailable or did not want to participate on that particular day. (Id. 69-70.)

After plaintiff took over the role of full-time driver's education teacher from Mr. Steele in

3

2003, plaintiff became in charge of the BTW after-school scheduling and used the same seniority based system that Mr. Steele had used. (Id. at 48.) In addition to being paid extra hourly compensation for the time he spent providing actual driving instruction, plaintiff also submitted and was paid for any time he spent preparing the BTW after-school schedule. (Id. at 73-74.)

By 2007, the driver's education program had dramatically increased to the point where there were 11 full-time teachers providing after-school driving instruction with an additional six retired teachers also participating in the program. The BTW program had also received authority from PennDOT to administer the driver's licensing test and approve the issuance of driver's licenses to participating students. As a result, the defendant decided to create a department chair position for the driver's education program. (Id. at 83-87.)

Plaintiff applied for and received an interview for the chair position. (Id. at 88.) Bonnie Bortz was selected by the defendant to be the Driver's Education Department Chairperson. (Id. at 92.) Ms. Bortz was born in 1952 and had been employed by the defendant since 1975. She had more seniority than plaintiff as she had been a certified driver's education instructor and had been participating in the BTW program since 1992. (Bortz Dep. at 6.)

Following the creation of the department chair position, the defendant implemented a new written scheduling policy/procedure for the BTW program. Under the new policy, driving assignments were scheduled for all instructors on a sequential rotation basis so that all the instructors would receive an equal number of assignments. As a result of the new scheduling procedure, plaintiff was no longer scheduled for driving instruction assignments every day and in fact he would have days when, due to the rotation, he was off. Plaintiff did not object to the new scheduling policy and in fact claimed that he even previously suggested to administration that the

4

scheduling policy be changed when he was in charge of BTW scheduling. (Reifinger Dep. at 66-68, 105-106, 109.) As a result of the new rotation system, plaintiff, as well as all of the other senior instructors, received less work than they did under the seniority system. (Bortz Dep. at 29.)

After Ms. Bortz became chairperson of the driver's education department and the new scheduling procedure was implemented, plaintiff claims that there were occasions when he could have and/or should have been called in to "fill" for an instructor that was unavailable. He objected to the use of retired instructors and believed that he should have been called in to "fill" if someone was unable to work before any retirees were called.

On February 20, 2009, plaintiff went to Ms. Bortz's office to discuss issues regarding the driver's education program and scheduling. (Id. at 112-114.) Following the meeting, Ms. Bortz e-mailed a complaint to the school administration about plaintiff, claiming he harassed her in her role as department chairperson and expressed that she did not feel comfortable or safe meeting alone with the plaintiff. (Bortz Dep. at 36; Defendant's Exhibit F.) Plaintiff testified that he does not believe that Ms. Bortz's actions in reporting plaintiff and accusing him of harassment were in any way related to his age. (Reifinger Dep. at 167.) According to Ms. Bortz, plaintiff "questioned everything in the whole [BTW] program." (Bortz Dep. at 37.)

Following a meeting with plaintiff, defendant's high school principal issued a written reprimand to plaintiff dated March 6, 2009, which detailed plaintiff's history of not cooperating with his fellow instructors in the BTW program with regards to scheduling. (Defendant's Exhibit G.) Specifically, the letter noted that during the 2008-2009 school year, plaintiff had accumulated more "fills" than any other driving instructor and that plaintiff would never agree to switch hours with anyone but would want to "fill" in for them so that he could get extra hours and thus more

5

compensation. ( Id.) Plaintiff himself testified that he did not want to switch hours with anyone---
"I didn't need to switch. I'm dedicated to the program. I planned to be there. I planned to work."
(Reifinger Dep. at 130.) In fact, plaintiff had previously told the other instructors that he did not
want to switch but if they could not find anyone to switch schedules with, then he would gladly
take their assigned time slot. (Id. at 135.)

Plaintiff scheduled a personal business trip from October 15, 2009 through October 21,
2009. (Id. at 182-185.) Plaintiff was scheduled for BTW instruction during his business trip.
Plaintiff never advised Ms. Bortz of his intentions regarding his BTW commitment during the
week he was off. On October 15, 2009, Ms. Bortz e-mailed plaintiff and inquired whether he
intended to keep his scheduled BTW appointments on October 17, 2009 through October 22,
2009. She advised him in the e-mail that unless she heard back from him that day she would get
other instructors to fill in for him. Since she did not hear back from plaintiff on October 15, 2009,
Ms. Bortz gave plaintiff's appointments to other instructors. (Defendant's Exhibit H.)

On April 21, 2010, two physical education teachers accused plaintiff of instructing a
student during a BTW session to drive a vehicle through a crosswalk which was being used by
students in the teachers' gym class. Following an investigation by school administration, a written
reprimand was issued to plaintiff which resulted in plaintiff being suspended from BTW
instruction until September 2010. (Defendant's Exhibit I.) After plaintiff filed a grievance with
the teacher's union, he was permitted to return to BTW instruction on August 9, 2010. (Id.)
Plaintiff testified that driving through a crosswalk without yielding to a pedestrian is a serious
offense and agreed that such a incident should have been investigated by school officials.
(Reifinger Dep. at 209, 213.) Plaintiff testified that he did not think Ms. Bortz had any

6

involvement with the investigation of the crosswalk incident of its outcome. (Id. at 222.)

Plaintiff applied for tuition reimbursement regarding courses which he wanted to take. The request was initially denied because the courses plaintiff wanted to take did not comply with the tuition guidelines in effect. When plaintiff corrected his request, the tuition reimbursement was approved. (Defendant's Exhibit K.)

In July 2011, the defendant terminated the BTW program and ceased to directly provide its students with BTW instruction or pay for BTW instructors. (Id. at 273.)  After defendant terminated its BTW program, plaintiff's only remaining employment with defendant involved his full-time classroom instruction as the high school's driver education teacher. (Id, at 278-279.) Plaintiff admits that he did not suffer any discrimination as a classroom instructor. (Id. at 104, 279.)

Plaintiff voluntarily gave notice of his retirement effective June 12, 2012. (Defendant's Exhibit K.) No one from defendant or its administration ever requested that plaintiff retire. (Reifinger Dep. at 268.)  At the time of his retirement, plaintiff was "making less money than being retired." (Id. at 278.)


**LEGAL ANALYSIS**

The ADEA prohibits an employer from discharging or discriminating against any individual over the age of forty "because of such individual's age." 29 U.S.C. § 623(a)(1). The Supreme Court has stated that "the ADEA's text does not provide that a plaintiff may establish discrimination by showing that age was simply a motivating factor. Gross v. FBL Financial Services, Inc., 129 S.Ct. 2343, 2349 (2009). Rather, to establish a claim under the ADEA, "a

plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." Id. at 2351.

Under the evidentiary framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence. "The existence of a *prima facie* case of employment discrimination is a question of law that must be decided by the court but the *prima facie* test remains flexible and must be tailored to fit the specific context in which it is applied." Wishkin v. Potter, 476 F.3d 180, 185 (3d Cir. 2007)(citing Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797-98 (3d Cir. 2003)(*per curiam*)). If a plaintiff establishes a *prima facie* case, the burden shifts to the employee to "articulate some legitimate, nondiscriminatory reason for the employee's rejection. . . .The plaintiff must then establish by a preponderance of the evidence that the employer's proffered reasons were merely a pretext for discrimination, and not the real motivation for the unfavorable job action." Sarullo, 352 F.3d at 797.

A plaintiff may establish a *prima facie* case of age discrimination under the ADEA by demonstrating that: (1) he is over forty, (2) he is qualified for the position in question, (3) he suffered from an adverse employment action, and (4) his replacement was sufficiently younger to permit a reasonable inference of age discrimination. See Hill v. Borough of Kutztown, 455 F.3d 225, 247 (3d Cir. 2006)(citing Potence v. Hazleton Area Sch.Dist., 357 F.3d 366, 370 (3d Cir. 2004)). Although the Court finds that plaintiff has met the first two requirements for a *prima facie* case of age discrimination, plaintiff has not met the third or fourth requirements on his constructive discharge claim.

8

To establish a claim of constructive discharge[2], and thereby satisfy the "adverse

employment action"[3] prong of the *prima facie* claim, plaintiff must offer evidence from which "'a

reasonable jury could find that the employer permitted conditions so unpleasant or difficult that a

reasonable person would have felt compelled to resign.'" Duffy v. Paper Magic Group, Inc., 265

F.3d 163, 167 (3d Cir. 2001) (quoting Connors v. Chrysler Fin.Corp., 160 F.3d 971, 974 (3d Cir.

1998)) (internal punctuation omitted). This is an objective test, under which, even where a

plaintiff "may have subjectively believed that the[] circumstances were too onerous to bear,"

constructive discharge is established only where a "reasonable trier of fact could conclude that

[the acts alleged] renders working conditions objectively intolerable." Id. at 169. Stressful,

frustrating and uncomfortable working conditions are insufficient; rather, a plaintiff must

demonstrate a pattern of conduct that rises to the threshold of intolerability. Id.

In the first instance, there is absolutely no evidence in the record to refute the conclusion

that plaintiff's decision to retire effective June 12, 2012 was anything but voluntary. Plaintiff

testified that no one from defendant or its administration ever requested that he retire. (Reifinger

Dep. at 268). Moreover, plaintiff announced his retirement on January 13, 2012,  approximately

six months after the BTW program had been terminated by the defendant. As a result, plaintiff

---

[2] Some examples of constructive discharge include 1) a threat of discharge; 2)
suggestions or encouragement of resignation; 3) a demotion or reduction in pay or benefits; 4)
involuntary transfer to a less desirable position; 5) alteration of job responsibilities; 6)
unsatisfactory job evaluations. See, e.g., Clowes v. Allegheny Valley Hospital , 991 F.2d 1159,
1161 (3d Cir. 1993).

[3] The Supreme Court has defined an adverse employment action as a "significant change
in employment status, such as hiring, firing, failing to promote, reassignment, or a decision
causing a significant change in benefits." Burlington Indus. Inc. v. Ellerth, 524 U.S. 742, 749
(1998).

could not have been exposed to any type of objectively intolerable working conditions as part of defendant's BTW program at the time he announced his retirement.  In addition, since the BTW program had been disbanded six months before he announced his retirement, plaintiff could not have been replaced by a younger individual under the age of 40.

The Court further finds that none of the working conditions or actions taken by the defendant during the time plaintiff worked for the BTW program comes close to being so objectively intolerable as to create an adverse employment decision. Nor is there any objective evidence that these working conditions or actions resulted from plaintiff being treated differently than a younger employee.

Plaintiff complains that the new rotating system was being implemented by Ms. Bortz in a way that favored younger individuals to the detriment of older instructors with more seniority. Yet when asked during his deposition what made him think he was treated differently in the way Ms. Bortz scheduled instructors, plaintiff responded as follows:

> Q. I know you are over 40 sir. What I want to know is why do you think that Ms. Bortz treated you differently because of your age in the way she scheduled things or in the way she treated other instructors?
>
> A. Am I allowed to say exactly how I feel?  Am I supposed to open up 100% here?
>
> Q. You're under oath, so when I ask you a question, yes, I want to know why you think it has anything to do with your age.
> . . . . . .
> A. I just think thee's an unfair scheduling practice here to accommodate friends of Paul Stewart.
>
> Q. Okay.
>
> A.  To accommodate people that coach and had someplace to do stuff when you're not coaching.

(Reifinger Dep. at 194-195).

Thus, according to plaintiff's own testimony, it was not his age which caused the new rotational system to be implemented in a way which, according to plaintiff, favored younger individuals, but rather it was Ms. Bortz's alleged decision to accommodate friends of Paul Stewart, another driving instructor, which caused any alleged scheduling discrepancy.

By 2007, the driver's education program had dramatically increased to the point where there were 11 full time teachers providing after-school driving instruction with an additional six retired teachers also participating in the program. The BTW program had also received authority from PennDOT to administer the driver's licensing test and approve the issuance of driver's licenses to participating students.

Following the creation of the department chair position, the defendant implemented a new written scheduling policy/procedure for the BTW program. The new program scheduled instructors for driving assignments on a sequential rotation basis so that all the instructors would receive an equal number of assignments. As a result of the new scheduling procedure, plaintiff was no longer scheduled for driving instruction assignments every day and in fact he would have days when, due to the rotation, he was off.  Plaintiff did not object to the new scheduling policy and in fact claimed that he even previously suggested to administration that the scheduling policy be changed when he was in charge of BTW scheduling. (Reifinger Dep. at 66-68, 105-106, 109.) Although plaintiff now claims that the new system was unfair, there is nothing objectively intolerable about assigning drivers on a sequential rotational basis so that all the instructors could be equally accommodated. It would naturally follow, that plaintiff's additional compensation (as well as that of the other senior instructors) would decrease in order to accommodate all the new

11

BTW instructors.

To the extent plaintiff claims that Ms. Bortz permitted other instructors to switch hours with one another if they could not attend their assigned BTW lessons, plaintiff himself testified that he did not want to switch with the other instructors. (Id. at 130.)

Indeed, the written reprimand plaintiff received on March 9, 2009 was in response to plaintiff's history of not cooperating with his fellow BTW instructors regarding scheduling. Plaintiff himself testified that he did not want to switch hours with anyone– "I didn't need to switch. I'm dedicated to the program. I planned to be there. I planned to work." (Reifinger Dep. at 130.) In fact, plaintiff had previously told the other instructors that he did not want to switch but if they could not find anyone to switch schedules with, then he would "gladly" take their assigned time slot. (Id. at 135.) The reprimand did not in any way alter plaintiff's conditions of employment. See, e.g., Weston v. Pennsylvania, 251 F.3d 420, 430-31 (3d Cir. 2001) (concluding that a reprimand is not an adverse action if it does not alter conditions of employment). Nor has plaintiff submitted any evidence that the reprimand was the result of him being treated differently than any instructor under the age of 40.

On October 15, 2009, Ms. Bortz e-mailed plaintiff and inquired whether he intended to keep his scheduled BTW appointments on October 17, 2009 through October 22, 2009. She advised him in the e-mail that unless she heard back from him that day she would get other instructors to fill in for him. Since she did not hear back from plaintiff on October 15, 2009, Ms. Bortz gave plaintiff's appointments to other instructors. (Defendant's Exhibit H.) The actions of Ms. Bortz were prudent, responsible and definitely did not create an objectively intolerable working condition. Nor has plaintiff submitted any evidence that Ms. Bortz's actions were the

12

result of plaintiff being treated differently than any instructor under the age of 40.

As to the written reprimand plaintiff received for having a student drive through a crosswalk during gym class, plaintiff himself testified that driving through a crosswalk containing a pedestrian is a serious offense and concedes that such a report should have been investigated by school officials. (Reifinger Dep. at 209, 213.) Plaintiff testified that he is unaware of Ms. Bortz having any involvement with the investigation of the crosswalk incident of its outcome. (Id. at 222.) Plaintiff testified that he is unaware of any similar allegations against other BTW instructors ever being reported to school officials. (Id at 209, 213, 224). Again, there is no evidence that the reprimand in any way altered the conditions of plaintiff's employment. Nor has plaintiff submitted any evidence, other than his own subjective belief, that the reprimand was the result of plaintiff being treated differently than any instructor under the age of 40.

Finally, there is no evidence that plaintiff's request for tuition reimbursement regarding courses which he wanted to take was initially denied because of plaintiff's age. On the contrary, the request was denied because the courses plaintiff wanted to take did not comply with the tuition guidelines in effect at the time. When plaintiff corrected his request, the tuition reimbursement was approved. (Defendant's Exhibit K.)

For the foregoing reasons, this Court finds that plaintiff was not constructively discharged by the defendant and did not in any other way suffer an adverse employment action. Nor was plaintiff presented any objective evidence other than his subjective belief that he was treated differently than a younger employee. As a result, plaintiff has failed to establish the third and

13

fourth prongs for a *prima facie* case of age discrimination.[4]

Plaintiff also claims he was retaliated against by defendant in response to his filing of his EEOC charge of discrimination in 2010. To establish a *prima facie* case of retaliation, plaintiff must show that: (1) the employee engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action. Urey v. Grove City College, 98 Fed.Appx 79, 81 (3d Cir. 2004).

For the reasons previously discussed, the Court finds, as a matter of law, that none of the defendant's actions of which plaintiff complains that occurred following the filing of his Charge with the EEOC in 2010 constitute an adverse employment action and as such plaintiff has failed to establish a *prima facie* case of retaliation.

Finally, because the Court has found that plaintiff has not stated a claim for age discrimination under the ADEA, judgment must be entered in favor of defendant on plaintiff's PHRA claim as well. See Minetola v. Commonwealth Tel.Co., 298 Fed.Appx. 177, 180 n.5 (3d Cir. 2008)("[t]he same legal standard applies to both the ADEA and the PHRA and therefore it is proper to address them collectively").

An appropriate Order follows.

---

[4] Even if plaintiff had made out a *prima facie* case of age discrimination, the Court finds that plaintiff has failed to establish that his age was even remotely *a* consideration let alone *the* consideration in any of the actions plaintiff complains about in this action.

14